**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

| | |
|---|---|
| LAURA PATTERSON, : | |
| : | Civil Action No.: |
| Plaintiff, : | |
| : | |
| v. : | **COMPLAINT** |
| : | |
| TRIPLE LIFT, INC., : | |
| : | **Jury Trial Demanded** |
| Defendant. : | |
| : | |

-------------------------------------------------------------X

Plaintiff Laura Patterson alleges as follows:

## PRELIMINARY STATEMENT

1.      The term "recessionary discrimination" describes when employers use economic layoffs to discriminate against "problematic" employees.   Triple Lift, Inc. ("Triple Lift" or the "Company") did exactly that when it engaged in a reduction in force ("RIF") during the covid-19 pandemic.  Plaintiff Laura Patterson, a six-year employee with a stellar track record, had recently announced her pregnancy before the global pandemic arose.  Ms. Patterson's supervisor, Kristen Napoli, immediately groaned and expressed her displeasure that she would lose an employee to pregnancy and maternity leave – something she later acknowledged and admitted in writing. Triple Lift quickly hired a male replacement and then terminated Ms. Patterson during its pandemic RIF.  Notably, the RIF resulted in the termination of approximately 18 employees, all of whom had been recent hires or otherwise been employed for a short period of time – except for two outliers: two employees included in the RIF were six-year employees.  One was Ms. Patterson, who was pregnant and would soon me taking maternity leave.  The other was a woman who had just given birth and was in the middle of her maternity leave.  Ms. Patterson's

1

recently hired replacement who started literally during the work-from-home quarantine period of the pandemic remains.  These facts speak for themselves.

2.     Ms. Patterson seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices in violation of the Family Medical Leave Act, 29 U.S.C. §§2601 *et seq.* ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

3.     Ms. Patterson will file a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e et seq. ("Title VII"), as well as Title VII as amended by the Pregnancy Discrimination Act ("PDA").  As soon as the EEOC completes its investigation into Ms. Patterson's complaint and/or issues a Notice of Right to Sue, Ms. Patterson will seek leave to amend this Complaint to add Title VII and PDA claims against Triple Lift.

4.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

5.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

7.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

8.      Plaintiff Laura Patterson is a former employee of Triple Lift.  Ms. Patterson, at all relevant times herein, met the definition of an "employee" under all relevant statutes.

9.      Defendant Triple Lift, Inc. is a foreign business corporation organized under the laws of the state of Delaware, with its principal place of business is located at 36 East 31st Street, 8th Floor, New York, New York, 10016.  At all relevant times, Triple Lift, Inc. met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.      **Background**

10.     Triple Lift is an advertising and technology company founded by Eric Berry, Ari Lewine and Shaun Zacharia that optimizes visual content in order to assist brands in bringing their content to desktops, mobile and video platforms.  The Company uses technology to create and distribute advertising content by: adjusting advertising placements in order to fit thousands of websites, producing product placement for television, using data to measure advertisements' performance and creating visual and video advertising experiences that are designed to drive engagement with the purchasing public.

11.     Ms. Patterson was already an accomplished marketing and graphic design professional when she arrived at Triple Lift in 2014.

12.     In 2012, Ms. Patterson graduated from the Parson's School of Design with an Associate of Applied Science (AAS) in Graphic Design.

3

13.     Ms. Patterson then went on to work as a Graphic Designer at Condé Nast where she worked with the Editors-in-Chief of several publications and worked as a Freelance Graphic Designer for numerous entities including the Michael J. Fox Foundation and Supergoop.

14.     These experiences made her a great fit for a Graphic Designer position at Triple Lift, which was at the time a two-year old fledging operation of approximately 30 employees located entirely in Manhattan.

15.     Over the next six years, Ms. Patterson would flourish at Triple Lift and her contributions would contribute to the Company's rapid growth and expansion.

16.     In 2013, Triple Lift's total revenue was only approximately $1 million, but in 2014 revenue grew to $7 million.

17.     In 2015, Forbes listed Triple Lift as one of the Top 100 "America's Most Promising Companies."[1]

18.     Fueled by several rounds of private equity investment, by 2018, Triple Lift's revenue reached $150 million and was featured on Forbes' list of "The Next Billion-Dollar Startups."[2]

19.     In 2019, Triple Lift's success continued as it exceeded its target revenue goal yet again.  Triple Lift's once local footprint has grown to a global one, with more than 300 employees located in nine offices around the world.

20.     During her tenure, Ms. Patterson contributed to the Company's fast and successful growth.

---

[1]     See https://www.forbes.com/most-promising-companies/list/ (last accessed May 26, 2020).
[2]     See https://www.forbes.com/next-billion-dollar-startups/2018/#21852f255261 (last accessed May 26, 2020).

21.     Ms. Patterson's work in marketing Triple Lift was beyond reproach as her performance reviews make very clear.

22.     In her 2016 review, the Company noted among many other compliments that, "**If I had to guess, Laura might actually bleed Triple Lift orange.**"

23.     In 2017, it was acknowledged that, "**Laura is a true team player.  She is always willing to help and pitch in on whatever is asked of her.**"

24.     For these reasons, and more, in or around 2016, Ms. Patterson was promoted to Senior Graphic Designer and was given control over a team of junior employees to manage, along with a raise.

25.     Notably, Ms. Patterson built the Company's brand guide from the ground up through defining brand colors and layouts, standardizing fonts, and creating rich visuals (such as images, graphic elements and custom icon set).

26.     These actions took Triple Lift from appearing as a startup to a well refined, unified, and recognizable brand.  That Triple Lift entrusted Ms. Patterson with these critical tasks and then implemented her ideas speaks volumes about her value to the Company.

27.     In 2019, her performance reviews were effusive with adulation:

> **Laura and her team were instrumental in the execution of team deliverables for first half - supporting the onsite, new demand and content dial gps, in-market presentations for IAB engage, Prog IO, Festival of media as well as our new sizzle reel, countless event presentations and deliverables that support our Tier One accounts.**
>
> **Performance consistently met expectations in all essential areas of responsibility, at times possibly exceeding expectations, and the quality of work overall was very good. The most critical annual goals were met.**

28.     In March 2020, Ms. Patterson rated herself as "Exceeds Expectations" and Triple Lift had no changes or additions to her own personal comments on her review.

29.     Although Ms. Patterson's tenure and success at Triple Lift speaks for itself, during her employment she has consistently received her full target bonus and her salary has doubled in her six years – further establishing the merit to her work.

## II.     Discrimination after Ms. Patterson Discloses Her Pregnancy

30.     In early December 2019, Ms. Patterson disclosed to her manager, Ms. Napoli, during a weekly 1:1 meeting that she was pregnant with her second child.

31.     Ms. Napoli was aware that Ms. Patterson was attempting to have another child as Ms. Patterson had been discussing her desire to grow her family starting in the summer of 2019.

32.     Ms. Patterson was naturally elated about delivering this news to all her friends, family and work colleagues.  However, Ms. Napoli did not share her excitement.

33.     After Ms. Patterson disclosed her pregnancy, Ms. Napoli said "**FUUUUCK!**"

34.     At the same time, Ms. Napoli threw her head back, rolled her eyes back to look at the ceiling and generally acted frustrated with the news.

35.     Ms. Patterson was stunned and hurt and did not know how to react.  After waiting a moment, Ms. Patterson said, "**This is supposed to be a good thing and it's only temporary. I've done this before and it worked out fine**."

36.     While Ms. Patterson is devoted to her career and has every intention to continue her professional growth – she also is fully committed to her job as a mother.

37.     As such, following the birth of Ms. Patterson's first child in 2018, she took full advantage of a four-month maternity leave as well as lactation accommodations upon her return.

38.     Clearly, Ms. Patterson thought, Ms. Napoli did not want to "deal with" her maternity leave and accommodations yet again.

39.     Ms. Patterson tried to assure Ms. Napoli that she would not be on maternity leave until July 2020 and said "it's a long time away" in an attempt to "lighten the blow" that she was pregnant.  Ms. Napoli remained upset.

40.     Naturally, Ms. Patterson continued to replay this conversation in her head in the following days.  Ms. Patterson was offended by Ms. Napoli's response to her pregnancy and was upset that despite her many years of commitment to Triple Lift, her pregnancy was going to be looked at as a "problem" that would become a hurdle to future success.

41.     After considerable thought, Ms. Patterson decided to raise her concerns with Ms. Napoli directly.

42.     On December 3, 2019, Ms. Patterson sent Ms. Napoli a Slack message in which she complained about Ms. Napoli's discriminatory response, how upset she was about it and that she felt the need to speak up.

43.     That exchange is set forth below:



44.     As shown, Ms. Napoli acknowledged that she engaged in the discriminatory response to Ms. Patterson's pregnancy disclosure because she did not want to deal with another member of her team leaving; namely, a leave of absence for an anticipated maternity leave.

45.     Ms. Napoli's response, of course, put Ms. Patterson in an even more uncomfortable position as it was made clear to her that any accommodation requests that she might need related to her pregnancy were going to be looked at as a "burden" on Triple Lift and/or Ms. Napoli.

46.     However, Ms. Napoli's response does reflect a recognition – not that there was any doubt – that Ms. Patterson was a valued member of the team.

47.     Despite being given an opportunity to right her wrong, Ms. Napoli thereafter continued to treat Ms. Patterson in a cold and distant manner and their relationship slowly started to deteriorate.

48.     Although Ms. Patterson had told Ms. Napoli her pregnancy news discretely in a 1:1, Ms. Patterson soon learned that Ms. Napoli had been telling others around the office rather than letting Ms. Patterson share the information on her own timeline.

49.     Moreover, the trust in which Ms. Napoli had previously demonstrated towards Ms. Patterson started to vanish as if overnight.

50.     For instance, Ms. Napoli began steering work and projects to others that previously would have been within Ms. Patterson's role and duties.

51.     On several occasions, Ms. Napoli raised her voice at Ms. Patterson.

52.     One particular incident occurred when Ms. Patterson provided an opinion to a colleague on a design direction and Ms. Napoli quickly snapped from across the room: "It doesn't matter what you think!  Your opinion isn't helpful."

53.     Ms. Patterson felt that Ms. Napoli no longer cared about her as an employee and that everything had changed upon announcing her pregnancy.

54.     But the mistreatment was not limited to Ms. Napoli, as others also seemed less than thrilled about her news.

55.     On December 30, 2019, Ms. Patterson informed Mica Gallanosa (Senior People Operations Manager) in Human Resources ("HR") that she was pregnant and would likely be taking maternity leave in July 2020.

56.     Ms. Gallanosa responded that she would "put some time on your calendar this month to chat and go over paperwork."

57.     However, Ms. Patterson never heard from Ms. Gallanosa or anyone else in HR thereafter to follow up.

58.     This process repeated itself several months later on March 20, 2020, when Ms. Patterson followed up stating, "Hey Mica, my husband just had a call with his HR to go over maternity paperwork so I wanted to use the reminder to see what I need to complete paperwork wise and if anything has changed about policy in the last two years."

59.     Again, Ms. Gallanosa never responded.

**III.    Unlawful Termination of Ms. Patterson's Employment**

60.     In or around early January 2020, on the heels if Ms. Patterson's pregnancy disclosure, Ms. Napoli informed her that Triple Lift was creating a new role of Creative Director.

61.     Upon information and belief, Triple Lift did not take any actions hire any Creative Director until after Ms. Patterson disclosed her pregnancy to Ms. Napoli.

62.     Upon information and belief, Triple Lift had not started any candidate search for the Creative Director position until after Ms. Patterson disclosed her pregnancy to Ms. Napoli.

63.     Triple Lift never informed Ms. Patterson that the company was creating this new Creative Director role until after she had already disclosed her pregnancy to Ms. Napoli.

64.     As Ms. Napoli explained to Ms. Patterson what the new role would cover, it sounded nearly identical to Ms. Patterson's job.

65.     Moreover, Ms. Napoli said that all of Ms. Patterson's direct reports would going forward report into this new role.

66.     Ms. Patterson felt she was being replaced no sooner than having mentioned her pregnancy, but Ms. Napoli tried to assuage her that it was not the case.

67.     In the weeks that followed, Ms. Napoli interviewed three people for the role – two women and one man.

68.     The job was offered to the man – Nick Lakiotes – and he started Monday, March 23, 2020 (a week later than initially expected due to the COVID-19 pandemic).

69.     Notably, Ms. Patterson was never afforded the opportunity to interview for this role, despite her six-year tenure at Triple Lift and years of positive performance reviews.

70.     Like virtually all other New Yorkers, Ms. Patterson has been quarantined and working at home since mid-March 2020 and has been communicating with her colleagues via email, Slack messages and Zoom conferences.

71.     In fact, Ms. Patterson's entire team – Ms. Napoli included – was having periodic Zoom conferences to discuss their ongoing work and division of duties.

72.     During several of these Zoom conferences, Ms. Patterson raised with her team the struggle and difficulty she was having balancing both her work and her childcare responsibilities.

73.      Others echoed Ms. Patterson's concerns, though she was clearly the most vocal about her feelings.

74.     On April 2, 2020, Ms. Patterson was out-of-the-blue invited to a Zoom conference with Ms. Napoli, Jordan Bitterman (Chief Marketing Officer) and Dana Kaplan.  The meeting was short, and they told Ms. Patterson that they had to let her go due to a COVID-related RIF.

75.     Ms. Patterson's termination was not due to performance-related issues.

76.     Upon information and belief, Ms. Napoli was involved in the decision to terminate Ms. Patterson's employment as her immediate supervisor.

77.     Triple Lift is not permitted to use a RIF as a means to discriminate or retaliate against its employees.

78.     Clearly, Ms. Napoli was ready to terminate and replace Ms. Patterson long before any layoff decisions had been made – and clearly, she was all too thrilled to terminate Ms. Patterson under the supposed cover of a RIF.

79.     Furthermore, to the extent senior-level employee on the team had to be terminated it clearly should have been Mr. Lakiotes long before any consideration of Ms. Patterson.

80.     Of course, that was never considered because Mr. Lakiotes was always hired to replace her from the start.

81.     Mr. Lakiotes remains employed by Triple Lift at the same level of pay he was earning prior to the RIF.

82.     Upon information and belief, Mr. Lakiotes is earning a higher salary than the salary Ms. Patterson was earning.

83.     Notably, the RIF generally focused on junior employees who had been with Triple Lift for between approximately a few months to a few years.

84.     However, there were two exceptions – Ms. Patterson and Tricia Tomaszewski (Vice President Brand Strategy and Acquisition), both of whom had been with the Company for six years.

85.     Ms. Patterson and Ms. Tomaszewski were the two longest tenured employees who were terminated in the RIF.

86.     The two long-tenured employees who were terminated share in common that they both have pregnancy and/or maternity-related accommodations.  At the time, Ms. Patterson was pregnant and about to take maternity leave and Ms. Tomaszewski was in the middle of her maternity leave.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)
### *Against Triple Lift, Inc.*

87.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

88.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Plaintiff, a full-time employee of Triple Lift, at all relevant times worked at least 1,250 hours in any 12-month period, and specifically, in the 12-month period preceding her termination.

89.     At all times relevant herein, Triple Lift was a "covered employer" within the meaning of the FMLA.  Triple Lift employs 50 or more employees in at least 20 calendar weeks within a 75-mile radius of the Company.

90.     By the actions described above, among others, Defendant has retaliated against Ms. Patterson for informing Triple Lift that she intended to avail herself of the rights and benefits of the FMLA.

91.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

## SECOND CAUSE OF ACTION
### (Unlawful Interference in Violation of the FMLA)
#### *Against Triple Lift, Inc.*

92.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

93.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA, and Triple Lift was a "covered employer" within the meaning of the FMLA.

94.     By the actions described above, among others, Defendant has unlawfully interfered with Ms. Patterson's right to take FMLA leave and return to work from such leave by unlawfully terminating her employment.

95.     As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
#### *Against Triple Lift, Inc.*

96.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

97.     Defendant has discriminated against Plaintiff on the basis of her gender and pregnancy status in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender and pregnancy status, including, *inter alia*, subjecting her to a hostile work environment and/or terminating her employment.

98.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

99.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

100.    Defendant's unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

<u>**FOURTH CAUSE OF ACTION**</u>
**(Retaliation in Violation of the NYSHRL)**
***Against Triple Lift, Inc.***

101.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

102.    Defendant has retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, terminating her employment.

103.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

104.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

105.    Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against Triple Lift, Inc.***

106.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

107.    Defendant has discriminated against Plaintiff on the basis of her gender and pregnancy status in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender and pregnancy status, including, *inter alia*, subjecting her to a hostile work environment and/or terminating her employment.

108.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

109.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental

anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

110.    Defendant's unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against Triple Lift, Inc.***

111.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

112.    Defendant has retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, terminating her employment.

113.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

114.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

115.    Defendant's unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendant and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 2, 2020
      New York, New York                         Respectfully submitted,

**WIGDOR LLP**

By: _____
            David E. Gottlieb
            Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
dgottlieb@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Attorneys for Plaintiff*